UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SHAWNICE BETTIS, BOYSING SAMUEL, JR.,
LAURA PINCAY, CHRISTOPHER
MONTEAGUDO, and KEANNA KOVOS, *on
behalf of themselves and all others similarly
situated*,

                Plaintiffs,

       v.

AMAZON.COM SERVICES LLC, *f/k/a AMAZON
SERVICES.COM, INC.*,

                Defendant.

**MEMORANDUM AND ORDER**

24-cv-07563-LDH-JAM

---

LᴀSHANN DᴇARCY HALL, United States District Judge:

Shawnice Bettis, Boysing Samuel, Jr., Laura Pincay, Christopher Monteagudo, and

Keanna Kovos (together, "Plaintiffs"), on behalf of themselves and all other similarly situated,

bring the instant action against Amazon.com Services LLC ("Amazon" or "Defendant"),

pursuant to the New York Labor Law ("NYLL"). Specifically, Plaintiffs assert claims for unpaid

minimum wages and overtime wages,[1] as well as a claim for failure to furnish the correct wage

---

[1] Plaintiffs expressly bring, as their first claim for relief, a claim for "unpaid wages" and "overtime wages" under Sections 198 and 663 of the NYLL. However, the complaint references "minimum wage[s]" in the allegations included as support for its first claim of relief. (*See, e.g.*, Second Am. Compl. ("Compl.") ¶ 72, ECF No. 22.) Moreover, as support for their first claim of relief, Plaintiffs cite to Section 142-2.1 of Title 12 of the New York Compilation of Codes, Rules & Regulations ("12 NYCRR §142-2.1"). Pursuant to 12 NYCRR §142-2.1(b):

> [t]he minimum wage shall be paid for the time an employee is permitted to work, or is required to be available for work at a place prescribed by the employer, and shall include time spent in traveling to the extent that such traveling is part of the duties of the employee.

Considering that the Second Amended Complaint (the "Complaint"): (1) references minimum wages in allegations regarding Plaintiffs' unpaid wages; and (2) cites to 12 NYCRR §142-2.1(b) and NYLL § 663, both of which, as discussed, *infra*, relate to minimum wages, the Court construes Plaintiffs' claim for "unpaid wages" as a claim for unpaid minimum wages.

statements.  Defendant moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiff's Second Amended Complaint (the "Complaint") in its entirety.

## BACKGROUND[2]

Amazon, a company incorporated in Delaware with its principal place of business in the State of Washington, is an "e-commerce" provider that sells goods on its website and delivers them to retail consumers.  (Second Am. Compl. ("Compl.") ¶¶ 6, 21, ECF No. 22.)  According to the Complaint, Amazon has created a network of "very large" fulfillment centers, sortation centers, and delivery stations (together, "Warehouses") where workers—called "associates"— are employed in various positions, including as "loaders, packers, pickers, diverters, stowers, line leaders, water spiders, and problem solvers."  (*Id.* ¶¶ 13, 23.)  According to the Complaint, associates at fulfillment centers fulfilled customers' orders by packaging them into boxes and sorting the boxes for delivery.  (*Id.* ¶ 22.)  Thereafter, the packages were transferred to sortation centers.  (*Id.*)  At sortation centers, associates were tasked with sorting packages to be sent to delivery stations located closer to each consumer.  (*Id.*)  From there, packages were sorted for local delivery by drivers employed by Amazon's delivery service partners.  (*Id.*)

Plaintiffs allege that Amazon employed thousands of workers at each of its Warehouses. (*Id.* ¶¶ 12, 23.)  Specifically, according to the Complaint, Amazon employed over 6,000 individuals as associates at each of its JFK8 and DNJ-3 warehouses located in Staten Island and the Bronx.  (*Id.* ¶ 12.)  This included Plaintiffs.  (*Id.* ¶¶ 14-18.)  Plaintiff Samuel, a New York resident, was employed as an associate at Amazon's JFK8 warehouse from February 2021 through September 2022, at a regular hourly rate of between $15.00 and $19.00 an hour.  (*Id.* ¶ 14.)  Plaintiff Bettis, a New York resident, was employed as an associate at Amazon's JFK8

---

[2] The following facts are taken from the Complaint and are assumed to be true for the purpose of deciding the instant motion.

warehouse from August 2023 through February 2024, at a regular hourly rate of between $15.00 to $19.00 an hour. (*Id.* ¶ 15.) Plaintiff Pincay, a New York resident, was employed as an associate at Amazon's JFK8 warehouse from November or December 2018 through December 2024, at a regular hourly rate of between $15.00 and $19.00 an hour. (*Id.* ¶ 17.) Plaintiff Kovos, a New Jersey resident, was employed as an associate at Amazon's JFK8 warehouse from September 2020 through December 2022, at a regularly hourly rate between $15.00 and $20.00 per hour. (*Id.* ¶ 18.) Plaintiff Monteagudo, a New York resident, was employed at Amazon's DNJ-3 warehouse from December 2019 through July 2020, at a regular hourly rate of between $17.50 to $19.00 an hour. (*Id.* ¶ 16.)

Next, according to the Complaint, Amazon used centralized electronic security, productivity, and time-keeping systems to monitor the activities of its associates, including Plaintiffs. (*Id.* ¶¶ 24, 29.) To that end, Amazon provided Plaintiffs with identification badges containing a magnetic stripe and other electronic information to be used while working at Amazon's Warehouses. (*See id.* ¶ 24.) Plaintiffs were required to swipe these identification badges to enter the Warehouses before the start of their shift and when clocking out after their shift to leave the Warehouses. (*Id.* ¶ 25.) Plaintiffs allege that Amazon's security systems registered each associate's swipe at the time of his or her entry into and exit from the Warehouses. (*Id.*) According to the Complaint, to maximize the productivity of associates, Amazon closely monitored the time that each associate, including Plaintiffs, clocked in at the beginning of his or her shift and clocked out for unpaid meal breaks or at the end of his or her shift each day. (*Id.* ¶ 26; *see id.* ¶ 30.) Associates were provided with two options by which to clock in and out—that is, record their work time. (*Id.* at 30.) Associates could record their time by using a physical time clock located within Amazon's Warehouses. (*Id.*) Alternatively, if they

3

possessed a cell phone, associates could record their time via a phone application called Amazon A to Z (the "A to Z App"). (*Id.*) Plaintiffs, however, allege that use of the A to Z App was limited by occasional technical issues and its design, which limited function to certain time periods or certain locations. (*Id.*)

Moreover, in furtherance of its goal of maximizing productivity, Amazon also implemented a "[thirteen-]point discipline scale." (*Id.* ¶ 27.) Under this scale, if an associate accrued thirteen disciplinary points on his or her personnel file, he or she would be terminated. (*Id.*) Plaintiff alleges that, under this scale, associates could incur a point for accumulating too much "time-off task[s]." (*Id.* at 28.) According to the Complaint, a "time-off task" is an activity performed during the working day that did not involve "production work" and involved time spent away from an associate's workstation, but was, nonetheless, conducted "on the clock." (*Id.*) Similarly, associates could incur disciplinary points for clocking in to start their shifts more than five minutes after the shift was scheduled to commence. (*Id.*) Plaintiffs allege that, despite penalizing associates for clocking in more than five minutes after the start of their respective shift, Amazon prohibited associates from clocking in more than five minutes prior to the start of their scheduled shifts. (*Id.* at 31.) And, Amazon paid wages only for the time it considered and recorded as working time in its timekeeping system. (*Id.* at 32.) According to the Complaint, if an associate performed work during periods not considered working time by Amazon, the time was not recorded in Amazon's timekeeping system, and the associate was not paid for that time. (*Id.*) Plaintiffs allege that Amazon required Plaintiffs to work at their assigned Warehouses for shifts that began and ended at times specified by Amazon. (*Id.* ¶ 33.) Plaintiffs further allege that these shifts were typically eight to ten hours in length each workday. (*Id.*) According to the Complaint, Plaintiffs were typically required to work a schedule dictated by Amazon and

4

consisting of at least forty hours of work per week. (*Id.*) During Amazon's "prime season," which is September through February of the next year, Plaintiffs were required to work more hours per week. (*Id.*)

Plaintiffs next allege that, as the first task of each working day, Amazon required associates to swipe in or show their badge to security prior to entering the Warehouses to work. (*Id.* ¶ 34.) In addition, from 2020 through 2022, during the Covid-19 pandemic, Amazon also required associates to queue in a single line and submit to a body temperature or fever screening before entering the Warehouses (together, "Start-of-Shift Activities"). (*Id.* ¶ 36.) Plaintiffs were permitted to clock in, commencing the recording of compensable time that day, after completing the Start-of-Shift Activities and entering the Warehouses. (*Id.* ¶ 37.) Plaintiffs allege that Amazon imposed procedures, policies, and circumstances that made it "impossible" for, or infrequent" that, associates would clock in immediately upon entering the Warehouses. (*Id.* ¶ 38.) For example, Amazon: (1) positioned time clocks a significant distance from the Amazon's Warehouses' entrances, increasing the time it took to clock in; (2) allowed numerous physical time clocks to fall into disrepair for prolonged periods of time; (3) required associates to secure a workstation assignment from their "superior" prior to being allowed to clock in; (4) limited the use and function of the A to Z App; and (5) imposed a thirteen-point scale that "coerced" associates into being present at Amazon's Warehouses more than five minutes before the start of their shift. (*Id.*) Plaintiffs allege that the amount of time that elapsed between the commencement of the Start-of-Shift Activities and clocking in totaled five to ten minutes each workday. (*Id.* ¶ 39.) During the Covid-19 pandemic, such time totaled up to thirty minutes each workday. (*Id.*)

According to the Complaint, Amazon also required associates, including Plaintiffs, to undergo a security screening at the end of each workday before leaving the Warehouses. (*Id.* ¶ 41.) During this screening Plaintiffs were required to queue in a single line and proceed through metal detectors and turnstiles, at which Plaintiffs swiped their identification badge (the "End-of-Shift Activities"). (*See id.* ¶ 43.) Plaintiffs were allowed to commence the End-of-Shift Activities only after clocking out. (*Id.* ¶ 42.) Plaintiffs were, thus, not compensated for the time spent undergoing the End-of-Shift Activities. (*Id.*) According to the Complaint, it typically took between five and ten minutes to undergo the End-of-Shift Activities. (*Id.* ¶ 44.) However, during the Covid19 pandemic, the time spent completing the End-of-Shift Activities ranged, "on average," from ten to twenty minutes. (*Id.*) Plaintiffs allege further that, occasionally, they and other associates would be selected by security guards for closer inspection of their bags, as required by Amazon, resulting in additional time spent completing the End-of-Shift Activities. (*Id.* ¶ 45.) Plaintiffs were, similarly, not compensated for time spent during any enhanced inspection. (*Id.*)

Finally, Plaintiffs allege that Amazon failed to provide them with correct wage statements and wage notices that "reflect[ed] all the time the NYLL recognizes as work." (*Id.* ¶¶ 48, 52.) Plaintiffs further allege that, because of this failure, Amazon was able to conceal its wrongdoing from associates. (*Id.* ¶ 52.) According to the Complaint, Amazon's "failure to provide NYLL notices" has also resulted in ongoing delayed payment of wages owed to Plaintiffs. (*Id.*)

## STANDARD OF REVIEW

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court deciding whether to grant a motion to dismiss must "draw all reasonable inferences in [the plaintiff's] favor, assume all 'well-pleaded factual allegations' to be true, and 'determine whether they plausibly give rise to an entitlement to relief.'" *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)) (internal citation omitted). "[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Further, a court is not obligated to accept a plaintiff's "conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber*, 648 F.3d at 104 (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008)).

## DISCUSSION

### I.    Unpaid Overtime and Unpaid Minimum Wage

The Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (the "FLSA"), requires the payment to all covered employees of a certain minimum wage, together with overtime compensation for employment in excess of forty hours. *See Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 31 (2014) ("[T]he FLSA established a [national] minimum wage and overtime compensation for each hour worked in excess of [forty] hours in each workweek." (citation omitted). The purpose of the FLSA, passed in 1938, was to ensure that employees receive a "'fair day's pay for a fair day's work.'" *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578 (1942) (quoting 81 Cong. Rec. 4983 (1937) (message of President Franklin D. Roosevelt)), *superseded by statute*, Portal–to–Portal Act, 61 Stat. 86–87, *as recognized* in *Trans World Airlines v. Thurston*, 469 U.S. 111, 128 n. 22 (1985). Stated differently, the FLSA's objective

7

was to "guarantee[] compensation for all work or employment engaged in by employees covered by the Act." *Tennessee Coal, Iron & R. Co. v. Muscoda Loc. No. 123*, 321 U.S. 590, 602 (1944). To that end, an employer who fails to compensate an employe for work covered under the Act can "be held civilly liable for backpay, liquidated damages, and attorney's fees" by establishing civil liability for an employer who violates the Act. *See Busk*, 574 U.S. at 31.

Similar to the FLSA, the NYLL is designed to ensure the wages of workers in the State of New York. *Cohan v. Columbia Sussex Mgmt., LLC*, No. CV 12-3203, 2018 WL 4861391, *4 (E.D.N.Y. Sept. 28, 2018) (citing *A.H. Phillips v. Walling,* 324 U.S. 490, 493 (1945)); *see also Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 472 (S.D.N.Y. 2015) ("The FLSA and the NYLL both 'guarantee[ ] compensation for all work . . . engaged in by [covered] employees." (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 359 (2d Cir. 2011))).  That is, the NYLL "is the state analogue to the federal [Fair Labor Standards Act ("FLSA")] . . . [and] mirrors the FLSA in compensation provisions regarding minimum hourly wages and overtime . . . ." *Santillan v. Henao*, 822 F. Supp. 2d 284, 292 (E.D.N.Y. 2011).  Specifically, under § 198 of the NYLL, employees are entitled to recover "full wages" for any unpaid wages, including minimum wages and overtime wages. *See id.* ("All employees shall have the right to recover full wages . . . accrued during the six years previous to the commencing of [any civil] action . . . . " (quoting N.Y. Lab. Law § 198(3)).  Likewise, § 663 of the NYLL provides that "[i]f any employee is paid by his or her employer less than the wage to which he or she is entitled under the provisions of [Article 19], he or she shall [be entitled to] recover in a civil action the amount of any such underpayments . . . . "  N.Y. Lab. Law § 663.  Pursuant to § 652 of the NYLL, a provision of Article 19, minimum wages constitute wages to which an employee is entitled.  N.Y. Lab. Law § 652 (establishing that "every employer shall pay each of its employees for each hour worked a

8

[minimum] wage" set forth in the section).  Moreover, NYLL § 663 entitles employees to wages established by regulations promulgated by the New York State Department of Labor ("NYDOL") under Article 19.[3]  Section 142-2.2 of Title 12 of the New York Compilation of Codes, Rules and Regulations ("12 NYCRR § 142-2.2") is a regulation issued by the NYDOL, pursuant to Article 19.[4]  *Wimbush*, No. 16CIV5363, 2018 WL 3388296, at *3 (first citing *Rocha v. Bakhter Afghan Halal Kababs, Inc.*, 44 F. Supp. 3d 337 (E.D.N.Y. 2014); and then citing *Diaz v. Elecs. Boutique of Am., Inc.*, No. 04-CV-0840E, 2005 WL 2654270, at *1 (W.D.N.Y. Oct. 17, 2005)).  Under § 142-2.2, "[a]n employer shall pay an employee for overtime . . . in the manner and methods provided in and subject to the exemptions of [the FLSA], as amended."[5]  12 N.Y. Comp.Codes R. & Regs. § 142–2.2 ("12 NYCRR § 142-2.2").  It, therefore, follows that unpaid

---

[3] *See Wimbush v. L.I.C. Pet Transp. Inc.*, No. 16CIV5363, 2018 WL 3388296, at *3 (S.D.N.Y. July 12, 2018) (explaining that the NYLL § 633 "extends to wage under-payments in violation of regulatory obligations," because "[u]nder [the NYLL § 2(17)], '[a]ll references to labor law, chapter, article, or section shall be deemed to include any rule, *regulation*, or order promulgated thereunder or related thereto.'"); *Eschmann v. White Plains Crane Serv., Inc.*, No. 11-CV-5881, 2014 WL 1224247, at *12 (E.D.N.Y. Mar. 24, 2014) ("Indeed, the NYLL itself was broadened to include commissioner orders." (citation omitted)); N.Y. Lab. Law § 2(17).

[4] Of relevance here, the regulation codified at 12 NYCRR § 142-2.1 was also issued by the NYDOL under Article 19.  As discussed, *supra*, § 142-2.1 establishes the obligations of an employer with respect to minimum wage.  12 N.Y. Comp. Codes R. & Regs. § 142–2.1 ("12 NYCRR § 142-2.1").  That is, the implementing regulation codified at § 142-2.1 further establishes that minimum wages constitute wages to which an employee is entitled under Article 19.

[5] Plaintiffs contend that, although 12 NYCRR § 142-2.2 references the FLSA, "as amended," the Portal-to-Portal Act is not incorporated into 12 NYCRR § 142-2.2 nor the NYLL.  (*See* Pl.'s Mem. L Opp'n Def.'s Mot. Dismiss ("Pl.'s Mem.") at 11-13, 16-17, ECF No. 29-6.)  This is so, according to Plaintiffs, because of the structure of the two sentences comprising § 142-2.2.  (*See id.* at 12-13, 16-17.)  Specifically, as Plaintiffs' argument goes, the first sentence of § 142-2.2, which references the FLSA, as amended, mandates only how the wage rate for overtime is to be calculated.  (*Id.* at 12; *see id.* at 16-17.)  Plaintiff argues that, on the contrary, the second sentence, which does not refer to the FLSA, mandates only what constitutes overtime.  (*Id.* at 12; *see id.* at 16-17.)  At bottom, Plaintiffs argue that, because the second sentence does not refer to the FLSA, the NYLL does not adopt the FLSA for the purpose of determining what work is compensable at the overtime rate.  (*See id.* at 12, 16-17.)  Plaintiffs' argument is illogical. As an initial matter, and as discussed, *supra*, it is well established in this Circuit that 12 NYCRR § 142-2.2, in its entirety, incorporates the FLSA, as amended by the Portal-to-Portal Act.  In addition, a plain reading of the statute suggests that although separate, the two sentences are not, as Plaintiffs argue, divorced:  Indeed, the second sentence serves to clarify "overtime" for the purposes of wage calculations, which are made in accordance with the federal regulations of FLSA.  *See* 12 NYCRR § 142-2.2.  That is, the second sentence expounds on the meaning of "overtime" as introduced in the first sentence, such that the FLSA is incorporated in both sentences—that is, the entire provision.  *See id.*  To hold otherwise would fly in the face of elementary principles of the construction of statutes, as well as general syntax.

overtime wages constitute those wages to which an employee is entitled under § 663. *See id.*; *Wimbush*, 2018 WL 3388296, at *3.

Against this backdrop, Amazon contends that the NYLL "tracks" the FLSA. (Def.'s Mem. L. Supp. Mot. Dismiss ("Def.'s Mem.") at 10, ECF No. 29-1.) And, as Amazon's argument goes, because the time spent by Plaintiffs completing the Start-of-Shift and End-of-Shift Activities is not compensable under the FLSA, the time spent with respect to these activities is, likewise, not compensable under the NYLL. (*Id.*) Therefore, Amazon argues, Plaintiffs' claims for unpaid overtime wages and unpaid minimum wages are ripe for dismissal. (*Id.*) The Court agrees.

Having long recognized that "[t]he NYLL 'applies the same exemptions [to overtime pay] as the FLSA,'" *Shang Shing Chang v. Wang*, No. 15-CV-4385, 2018 WL 1258801, at *4 (E.D.N.Y. Mar. 12, 2018) (quoting *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101 (2d Cir. 2010), *abrogated on other grounds by Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219 (2d Cir. 2018)), courts in the Second Circuit analyze NYLL overtime claims under the same standards governing claims for overtime under the FLSA.[6] "[T]o state a plausible FLSA overtime claim, . . . plaintiff[s] must sufficiently allege 40 hours of work in a given workweek," *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013), and "provide sufficient detail about the length and frequency of their unpaid work to support a reasonable

---

[6] *See, e.g., Chase v. MADICORP*, No. 623CV00436, 2024 WL 841266, at *5 (N.D.N.Y. Feb. 28, 2024) (finding that "the NYLL overtime claim . . . is co-extensive with the claim for unpaid overtime under the FLSA" and dismissing the overtime claim based on its analysis of the FLSA overtime claim); *Rilloraza v. Rhodes*, No. 21-CV-3305, 2023 WL 7686699, at *7 (E.D.N.Y. Sept. 8, 2023) ("The NYLL incorporates and restates the FLSA's requirements, and the analysis of overtime claims under the NYLL is generally the same as under the FLSA."); *Bronx Conservatory of Music, Inc. v. Kwoka*, No. 21CIV1732, 2022 WL 4096069, at *2 (S.D.N.Y. Sept. 7, 2022) ("Claims for overtime pay under the NYLL are evaluated under the same standards as claims under the FLSA."); *see also Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.1 (2d Cir. 2012) ("Like the FLSA, the NYLL 'mandates overtime pay and applies the same exemptions as the FLSA.' [The Circuit] therefore discuss only the FLSA, and do[es] not engage in a separate analysis of plaintiffs' NYLL claims." (internal citation omitted)).

10

inference that they worked more than forty hours in a given week," *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013); *see also Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 89 (2d Cir. 2013) (finding that a party's claims failed because "[s]he did not estimate her hours in any or all weeks or provide any other factual context"). That said, it is axiomatic that to sufficiently plead a claim for unpaid overtime under the NYLL, a plaintiff must allege that they, first, engaged in work that is compensable under the FLSA, and therefore by extension the NYLL. Of relevance here, under the FLSA, as amended by the Portal-to-Portal Act, 29 U.S.C. §§ 251–262,[7] "activities performed either before[, i.e., preliminary activities] or after the regular work shift[, i.e., postliminary activities] . . . are compensable . . . if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed." *Gorman*, 488 F.3d 586, 590 (2d Cir. 2007) (citation omitted). "[A]n activity is integral and indispensable to the principal activities that an employee is employed to perform . . . if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Busk*, 574 U.S. at 37.

---

[7] The Portal-to-Portal Act, which amended the FLSA in 1947, represented an attempt by Congress to delineate certain activities which did not constitute work, and therefore did not require compensation, in the face of Supreme Court holdings interpreting the meaning of "work" broadly. To that end, the Portal-to-Portal Act created two exemptions from FLSA-mandated compensation, the latter of which is relevant here:

   (1)  Walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform; and

   (2)  Activities which are preliminary to or postliminary to said principal activity or activities,

   which occur either prior to the time on any workday at which such employee commences, or subsequent to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

*Gorman*, 488 F.3d at 590 (quoting 29 U.S.C. § 254(a)).

There can be no legitimate question that the Start-of-Shift and End-of-Shift Activities are properly classified as "preliminary" and "postliminary" activities.  As explained by the implementing regulations of the FLSA, "preliminary" and "postliminary" activities include, *inter alia*, "checking in and out and waiting in line to do so . . . ."  *Busk*, 574 U.S. at 34 (internal quotation marks omitted) (quoting 29 C.F.R. § 790.7(g)).  At bottom, these are the very activities that comprise the Start-of-Shift and End-of-Shift Activities for which Plaintiffs now seek overtime pay.  (*See* Compl. ¶¶ 34, 36, 41.)  It is also plain that the Start-of-Shift and End-of-Shift Activities were not "integral and indispensable to the principal activities" of Plaintiffs' employment.

Here, Plaintiffs allege that Amazon employed associates, including Plaintiffs, as "loaders, packers, pickers, diverters, stowers, line leaders, water spiders, and problem solvers."  (*Id.* ¶ 13.)  Although the Complaint fails to specify Plaintiffs' roles at Amazon, Plaintiffs allege that, fundamentally, associates at Amazon's Warehouses were hired for the purpose of packaging a customer's order or sorting packages containing a customer's order for delivery to the customer.  (*Id.* ¶ 22.)  Stated plainly, Plaintiffs concede that the only "principal activities" for which they were "employed to perform" were packaging and sorting customer orders.  (*See id.*)  *Busk*, 574 U.S. at 37.  Certainly, neither the Start-of-Shift Activities nor the End-of-Shift Activities are "intrinsic element[s]" of—that is, necessary to effectuate—Plaintiffs' principal activities.  *Busk*, 574 U.S. at 37 (finding that "the employees' time spent waiting to undergo and undergoing [the defendant's] security screenings [did] not meet the[] criteria" of the integral and indispensable test); *see, e.g.*, *IBP, Inc. v. Alvarez*, 564 U.S. 21, 41-42 (2005) (concluding that time spent by employees waiting to put on protective clothing was not "integral and indispensable" to their "principal activit[ies,]" and therefore not compensable); *Gorman*, 488 F.3d at 594 (2d Cir. 2007)

12

(explaining that donning and doffing of "helmet, safety glasses, and steel-toed boots may be indispensable to plaintiffs' principal activities without being integral"); *Chase*, 2024 WL 841266, at *4-5 (finding that time "pre-shift waiting time" and "driving time" was not compensable); *Stewart v. Hudson Hall LLC*, No. 20-CV-885, 2021 WL 1750368, at *10 (S.D.N.Y. May 4, 2021) (finding that time spent waiting for locker to store tools for work not compensable).  Indeed, the only allegation contained in the Complaint connecting the Start-of-Shift and End-of-Shift Activities to the successful execution of the principal activities is the allegation that the Start-of-Shift and End-of-Shift Activities were required by Amazon each workday.  (Compl. ¶¶ 34, 36, 41.)  However, "the fact that an employer required an activity" does not, without more, satisfy the integral and indispensable test.  *Busk*, 574 U.S. at 36.  As made clear by the Supreme Court, "[i]f the test could be satisfied merely by the fact that an employer required an activity, it would sweep into 'principal activities' the very activities that the Portal–to–Portal Act was designed to address" when amending the FLSA.  *Id*.  As such, the Start-of-Shift and End-of-Shift Activities are not compensable for overtime purposes.  Accordingly, Plaintiffs' claim for unpaid overtime must necessarily fail.

To avoid this conclusion, Plaintiffs argue that, in light of the Second Circuit decision in *Del Rio v. Amazon.com.dec LLC*, 132 F. 4th 172 (2d Cir. 2025), the Court must "conduct a thorough examination of the NYLL's text, purpose, administrative interpretations, and legislative history and intent."  (Pl.'s Mem. L. Opp'n Def.'s Mot. Dismiss ("Pl.'s Mem.") at 3-4, ECF No. 29-6.)  Not so.  In *Del Rio*, like here, the plaintiffs filed a complaint alleging that the defendant violated Connecticut's wage laws by failing to compensate employees for the time spent undergoing mandatory screening.  132 F. 4th 172, 174-76 (2d Cir. 2025).  However, following the district court's grant of the defendant's motion for summary judgment, the plaintiffs filed a

motion to certify a question as to whether such time was compensable under Connecticut's wage laws. *Id.* at 176. To determine whether certification to the Connecticut Supreme Court was proper, the Circuit considered three factors, the first of which is relevant to Plaintiffs' argument here. *Id.* at 176-81. Under the first factor, the Circuit assessed whether any Connecticut state court decision provided an authoritative answer. *Id.* at 177. Finding that no such decision existed, the Circuit engaged in statutory analysis to deduce whether mandatory screening was compensable under the Connecticut wage laws. *Id.* at 177-79. Ultimately, the Circuit concluded that, because it was left without any clear authority, the first prong weighed in favor of certification. *Id.* at 179. *Del Rio* is inapposite. This Court is not entertaining a motion to certify any question before the state court, nor would it. Moreover, in *Del Rio*, the court concluded that certification of the question was necessary because of the absence of case law or statutory authority on the subject. *Id.* at 177-79. That is not the case here. As discussed, *supra*, there are ample cases within this circuit interpreting the NYLL as applying the same exceptions as FLSA within the context of overtime wages.[8] Moreover, as discussed previously, the statute expressly incorporates by reference the exemptions included in the FLSA at § 142-2.2. 12 NYCRR § 142-2.2. In other words, the Court has all the information that it needs to conclude that, under the NYLL, consistent with the FLSA, the Start-of -Shift Activities and End-of Shift Activities and not compensable as overtime. Plaintiffs' claims for overtime wages must, therefore, be dismissed.

Plaintiffs' claims for unpaid wages fare no better. As with a claim for overtime wages, to plead a claim for unpaid minimum wages claim here, Plaintiff must establish that the Start-of Shift Activities and End-of Shift Activities is compensable. For the reasons discussed *supra*,

---

[8] *Supra* note 6.

14

they are not. This conclusion is buttressed by the NYDOL's interpretation of 12 NYCRR § 142-2.1, which pertains to minimum wage. As outlined by the state court in *Henix v. Liveonny, Inc.*, in August 2010, the NYDOL opined on an employer's rights and obligations to pursuant to 12 NYCRR § 142-2.1(b). No. 158222/2016, 2021 WL 127046, at \*5 (N.Y. Sup. Ct. Jan. 13, 2021). Specifically, the court explained that the NYDOL "interprets the language of [12 NYCRR § 142-2.1] in line with the federal regulations . . . under the [FLSA] . . . ." *Id.* (internal quotation marks and citations omitted). Relying on the NYDOL's interpretation, the state court utilized the standard set forth in the FLSA to decide whether Plaintiffs' time traveling was compensable under the NYLL, concluding that it was not. *Id.* at \*5-6. As Plaintiffs' aptly noted, "[a]s a general rule, courts must defer to an administrative agency's[, like the NYDOL,] rational interpretation of its own regulation." *Andryeyeva v. New York Health Care, Inc.*, 33 N.Y.3d 152, 174 (2019). Notably, the NYDOL's interpretation of 12 NYCRR § 142-2.1(b) is in line with the FLSA and it is neither irrational, unreasonable, nor contrary to the plain meaning of the 12 NYCRR § 142-2.1(b), as would be required for this Court to entertain an interpretation outside that of the NYDOL. *See Henix*, No. 158222/2016, 2021 WL 127046, at \*5 (N.Y. Sup. Ct. Jan. 13, 2021) (finding that a court is not required to accept "an administrative agency's interpretation of its regulations" when the interpretation is "irrational and unreasonable") (quoting *Andryeyeva*, 33 N.Y.3d 152, 174). Indeed, the language of 12 NYCRR § 142-2.1(b) is, as Amazon argues, "materially indistinguishable" from the federal regulations under the FLSA, thus supporting the NYDOL's interpretation of the regulation.[9] Applying the standards set forth in the FLSA, it is,

---

[9] *Compare* 12 NYCRR § 142-2.1 ("The minimum wage shall be paid for the time an employee is permitted to work, or is required to be available for work at a place prescribed by the employer, and shall include time spent in traveling to the extent that such traveling is part of the duties of the employee."), *with* 29 C.F.R. § 785.38 ("Time spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked."), *and with* 29 C.F.R. § 785.14 ("Whether waiting time is time worked under the Act depends upon particular circumstances . . . . 'Facts may show that the employee was engaged to wait or they may show that he waited to be engaged.'" (quoting *Skidmore v. Swift*, 323 U.S. 134 (1944)).

plain that under the NYLL Start-of-Shift Activities and End-of-Shift Activities are not compensable for minimum wage purposes.

Indeed, any conclusion to the contrary would lead to an absurd result. To illustrate, consider two hypothetical associates at Amazon, Jayden and Rachael. In a particular week, Jayden records forty hours on the time clock, whereas Rachael records only thirty hours. Moreover, during the week, Jayden and Rachael each spend ten minutes completing the Start-of-Shift Activities prior to clocking in, and ten minutes completing the End-of-Shift Activities after clocking out. That is, in total, Jayden and Rachael each allocate twenty minutes per day completing the Start-of-Shift and End-of-Shift Activities. Because Jayden already recorded forty hours during the week, any NYLL claim for unpaid wages brought with respect to the Start-of-Shift and End-of-Shift Activities would constitute overtime wages. *See Lundy*, 711 F.3d at 114. At the same time, any NYLL claim for unpaid wages brought by Rachael—whose total worked hours do not trigger overtime—would be for minimum wages. *See* N.Y. Lab. Law § 663; 12 NYCRR § 142-2.1. But if a court were to refuse to extend the application of the FLSA standards to Rachael's minimum wage claims, as the law plainly requires of Jayden's overtime wages, inconsistent outcomes would necessarily result: On the one hand, the time allocated by Rachael to the Start-of-Shift and End-of-Shift Activities would be compensable under the NYLL as unpaid minimum wages. On the other hand, the overtime spent by Jayden on the Start-of-Shift and End-of-Shift Activities would not be compensable under the NYLL. To put a finer point on it, Plaintiff's argument would require the Court to carve out different compensation frameworks for overtime and minimum wages in the NYLL, where no such distinction is supported. The Court declines to do so.

The NYLL follows the standard set forth in the FLSA, as amended, with respect to minimum wage and overtime.  The Start-of-Shift and End-of-Shift Activities, therefore, are not compensable under the NYLL, and Plaintiffs' claims for unpaid minimum wage and overtime wages, pursuant to the NYLL, are dismissed, accordingly.

## II.    Failure to Furnish Correct Wage Statements

Plaintiffs complain that Amazon failed to provide them with wage statements reflecting the time spent on Start-of Shift Activities or End-of Shift Activities.  (*Id.* ¶ 48.)  In seeking dismissal of Plaintiffs' wage statement claim, Amazon argues that Plaintiffs lack standing. (Def.'s Mem. at 18-20.)  The Court agrees.

"Article III, Section 2 of the [United States] Constitution limits the subject-matter jurisdiction of the federal courts to 'Cases' and 'Controversies.'"  *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020) (citing *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992).  The standing doctrine is borne out of Article III as a means of "'ensur[ing] that federal courts do not exceed their authority as it has been traditionally understood.'"  *SM Kids*, 963 F.3d 206, 211 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  To prove constitutional standing, "a plaintiff must adequately establish: [](1) an injury in fact (*i.e.,* a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (*i.e.,* a '"fairly ... trace[able]"' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.,* it is '"likely"' and not 'merely "speculative"' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)."  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008) (quoting *Defenders of Wildlife*, 504 U.S. at 560-61).

17

In the context of wage and notice claims under NYLL § 195(3), to have standing in federal court "a plaintiff cannot rely on [only] 'technical violations' of the [NYLL] but must allege 'actual injuries suffered as a result of the alleged . . . wage notice and wage statement violations.'" *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 305, 306 n.1 (2d Cir. 2024) (collecting cases). That is, "an important difference exists" between: (1) "a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law"; and (2) "a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* (internal quotation marks omitted) (quoting *Ramirez*, 594 U.S. at 426-27). "[O]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court. *Id.* at 306 (emphasis in original) (quoting *Ramirez*, 594 U.S. at 427). Here, Plaintiffs allege they were harmed because, according to the Complaint, Amazon's failure to provide a wage and notice statement that included the Start of Shift Activities and End-of-Shift Activities delayed minimum wage and overtime payment to Plaintiffs. (Compl. ¶ 52.) However, this allegation does not establish the requisite concrete harm. This is so because, as discussed, *supra*, Plaintiffs were not entitled to be paid for these activities in the first place. Plaintiffs lack standing to assert a wage-statement claim, and the claim is dismissed accordingly.[10]

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED, and Plaintiffs' Second Amended Complaint is DISMISSED.

---

[10] In addition, because Plaintiffs are former employees of Amazon, (*id.* ¶¶ 14-18), Plaintiffs lack standing to seek the requested injunctive and declaratory relief. *Smalls v. Amazon.com Servs. LLC*, No. 20CV5492, 2022 WL 356432, at *5 (E.D.N.Y. Feb. 7, 2022) (internal quotation marks omitted) ("[Plaintiffs] lack[] standing to seek injunctive or declaratory relief against [their] former employer." (quoting *Kassman v. KPMG LLP* 925 F. Supp. 2d 453, 465-66 (S.D.N.Y. 2013)) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 364 (2011))), *aff'd*, No. 22-615, 2022 WL 17491259 (2d Cir. Dec. 8, 2022).

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2026

/s/ LDH
LᴀSHANN DᴇARCY HALL
United States District Judge